UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

No. 98 Civ. 4567 (RJS)

---

JOSE FELTON,

Petitioner,

VERSUS

WILLIAM MAZZUCA,

Respondent.

---

OPINION AND ORDER
September 26, 2012

---

RICHARD J. SULLIVAN, District Judge:

Petitioner Jose Felton brings this amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"), challenging his conviction in New York State Supreme Court, Bronx County, for murder in the second degree. Petitioner asserts four principal grounds for relief: (1) his due process rights were violated when the trial court provided the jury with a written copy of the jury instructions; (2) he received ineffective assistance of appellate counsel; (3) the denial of his petition to vacate his conviction constituted a violation of the Equal Protection Clause of the Fourteenth Amendment because his codefendant's conviction was subsequently reversed on the basis of an error equally applicable to Petitioner's trial; and (4) his Sixth Amendment right of confrontation was violated because the trial court admitted into evidence a confession by a non-testifying codefendant. For the reasons that follow, the Petition is denied.

I. BACKGROUND

A. Facts[1]

On March 2, 1981, Gregory Gier was found dead in his Bronx apartment. (Vol. 1 Tr. 35, 40-41.) Three individuals – Rafael Diaz, John Pridgen, and Petitioner – were subsequently charged with and convicted of second degree felony murder under New York Penal Law § 125.25(3). The investigation that led to the arrest of these

---

[1] The facts are drawn from the testimony received at the omnibus motion hearing for Petitioner's motion to suppress evidence and sever trial ("Hrg."), the subsequent trial ("Vol. 1 Tr." and "Vol. 2 Tr."), and from exhibits attached to Respondent's Answer ("Ex.").

individuals began when Gier's body, covered by a blanket, was discovered by his father. Gier's dresser had been "torn apart," his clothes were strewn around the apartment, and his television and radio were missing. (Vol. 1 Tr. 35-37.) After performing an autopsy, the medical examiner concluded that Gier died sometime on February 27, 1981 due to a combination of small stab wounds and severe blunt force injuries to the head and chest consistent with stomping and kicking. (Vol. 2 Tr. 137, 141-42, 153-54, 159-60.) The police recovered what later turned out to be Petitioner's fingerprints from a glass and rum bottle. (Vol. 1 Tr. 71-72; Vol. 2 Tr. 182-84.) The police also recovered a receipt showing the purchase of a telephone amplifier[2] in the evening of February 27. (Vol. 1 Tr. 82-83.)

In the course of the ensuing investigation, Detective Frank Viggiano learned that Petitioner and Gier were good friends and that Petitioner was the last person known to have seen Gier alive. (Hrg. 74.) On March 14, 1981, Viggiano met Petitioner at his home and asked him to come to the precinct for questioning. (Vol. 1 Tr. 83, 85.) Petitioner and his brother, Matthew Felton, who also knew Gier, accompanied Viggiano to the precinct. (*Id.* at 86-87.) There, Petitioner made three increasingly inculpatory oral statements, each of which was reduced to writing by Viggiano and signed by Petitioner. Initially, Petitioner stated that he spent the night at Gier's apartment on February 26 and claimed that he saw Gier's telephone amplifier there that evening. (*Id.* at 88-89.) According to Petitioner, he received a ride from Gier to a subway station the morning of February 27, and had not seen Gier since.

(*Id.* at 87-88.) After Viggiano confronted Petitioner with the fact that the amplifier had not been purchased until the evening of February 27, Petitioner agreed to tell Viggiano "what really happened" and offered his second statement. (*Id.* at 90-91.)

Petitioner then admitted that he had been with Gier the night of Gier's death. Specifically, Petitioner stated that he had spent the previous night and morning at Gier's apartment before meeting up with Gier again on the evening of February 27. (*Id.* at 96-97.) At that time, the two men went to Radio Shack to purchase the telephone amplifier and then bought rum and Chinese food. (*Id.* at 97.) They then drove to Gier's apartment where Petitioner said that he saw two men outside the building. (*Id.*) He recognized one of them as John Pridgen, and the other was introduced as Rafael Diaz. (*Id.*)

Gier invited all three men to the apartment, and they drank the rum and ate the Chinese food. (*Id.*) Later, Gier requested that Petitioner and Pridgen leave, but all three visitors left together. (*Id.* at 98.) Petitioner claimed that upon descending to the lobby, Pridgen told him to wait around while they purchased some marijuana. (*Id.*) Diaz then went back up the stairs to Gier's apartment, and Petitioner and Pridgen followed a few minutes later. (*Id.*) Petitioner stated that he waited in the hallway while Diaz was inside the apartment. (*Id.*) From the hallway, he said that he heard Gier yelling in pain and then saw Diaz run out of the apartment with a radio. (*Id.*) Petitioner went into the apartment and saw Gier lying on the floor with a blanket over him. (*Id.*) Pridgen then picked up the television and carried it downstairs. (*Id.* at 99.) Petitioner and Pridgen left in a taxicab together. (*Id.*)

---

[2] A telephone amplifier is essentially a stand-alone speakerphone that can be connected to a phone without built-in speakerphone functionality. (Vol. 1 Tr. 89.)

2

After making this statement, Petitioner was placed under arrest. (*Id.*) Following his arrest, Petitioner asked Viggiano what was going to happen, and Viggiano said that he was going to try and locate Pridgen and Diaz and get statements from them. (*Id.* at 101.) Viggiano also told Petitioner that if there were additional facts that he had not yet relayed, then he should disclose them immediately. (*Id.*) At that point, Petitioner offered a third statement. (*Id.* at 102.)

Petitioner's third statement differed from his second at the point in time when all three men were in the lobby after first leaving Gier's apartment. This time, Petitioner stated that the three men discussed whether Gier had eight hundred dollars in cash in his apartment and if they could get Gier's television out of the apartment without alerting the doorman. (*Id.* at 103.) He stated that the three men decided to go back to the apartment. (*Id.*) Diaz entered the apartment while Pridgen and Petitioner waited in the hallway. (*Id.*) After Diaz entered, Petitioner heard Gier yelling in pain. (*Id.*) Pridgen told Petitioner that they should see what was going on, and, upon entering the apartment, saw Diaz kicking Gier on the floor. (*Id.*) Petitioner told Diaz that it was enough and to stop. (*Id.* at 104.) Petitioner then told Pridgen that there was no possible way to get the television out of the apartment. (*Id.*) At that point, Diaz took the radio and left the apartment. (*Id.*) Thereafter, Pridgen took the television, and left with Petitioner. (*Id.*) They got into a taxicab and went to an area near Pridgen's home. (*Id.*) Pridgen got out and told Petitioner not to say anything about what happened. (*Id.*)

Thereafter, Viggiano questioned Pridgen about the murder, and Pridgen signed a written confession to the crime. (*Id.* at 117, 124-27.) Pridgen's confession substantially echoed Petitioner's third statement and provided further details. Pridgen additionally stated that Petitioner told him and Diaz that Gier "had gotten paid and had some money," and that Diaz asked Petitioner questions about the money and where it was. (*Id.* at 125.) Pridgen also admitted that he wanted to take Gier's television. (*Id.*) Pridgen stated that the three men had initially planned to return to Gier's apartment together, but then decided to send Diaz up first. (*Id.*)

After giving the statement, Pridgen took Viggiano to his girlfriend's apartment, where he retrieved Gier's television and gave it to Viggiano. (*Id.* at 129-30.) Subsequently, Viggiano located Diaz and arrested him. (*Id.* at 139-40.) Diaz made a written and videotaped confession. (Hrg. 62-63, 73.)

Before trial, all three defendants moved to sever their trials because the prosecution planned to introduce into evidence the statements that each defendant had made. (*See id.* at 192.) The trial court granted the motion to sever Diaz's trial, but denied the motion to sever Petitioner's and Pridgen's trials. (Ex. 2 at 11-12.)[3] The court reasoned that Diaz's statement was different from both Petitioner's and Pridgen's statements in that Diaz's statement implicated the other two in the death of Gier. (*Id.*) However, the court found that Petitioner's and Pridgen's statements could be considered "interlocking" because of their similarity, and, therefore, severance was not warranted. (*Id.*)

At trial, the prosecution introduced into evidence Petitioner's and Pridgen's written

---

[3] The trial court's decision on the motion to sever was not provided to the Court, but, because its decision on this motion is not in dispute and its reasoning is provided only for context, the Court assumes that the description provided in the state's appellate brief is correct.

3

statements, subject to the trial court's limiting instructions that statements made by Pridgen could be considered only against Pridgen and not against Petitioner. (Vol. 1 Tr. 123.) The medical examiner testified that Gier succumbed to blunt force trauma, with injuries to his body that were consistent with stomping and kicking. (Vol. 2 Tr. 153.) Petitioner's trial counsel called as his only witness Matthew Felton, Petitioner's brother, who testified that Petitioner told him, among other things, that Pridgen forced him to ride in the taxicab. (*Id.* at 235.) He also testified that, at the precinct, the police had given Petitioner beer and wine during the interrogation and that Petitioner looked glassy-eyed. (*Id.* at 198-99, 221.)

In his summation, Petitioner's trial counsel stated that the prosecution's case against Petitioner was limited to the statements given to Viggiano. (*Id.* at 280.) He argued that it did not make any sense for Petitioner to plan to rob Gier with two other people when, if Petitioner were so inclined, he had every opportunity to do so on his own. (*Id.*) Regarding the presence of Petitioner's fingerprints at Gier's apartment, trial counsel stated that the expert could not testify when the fingerprints were left at the scene and that it would not be unusual to find Petitioner's prints at the apartment because he was friends with Gier. (*Id.* at 285.) Finally, trial counsel argued that Petitioner's statements were made involuntarily based on Matthew Felton's testimony that Petitioner was glassy-eyed and that the police had given Petitioner beer and wine during the interrogation. (*Id.* at 286-87.)

The prosecution, in its summation, argued that the statements were voluntary and noted that Petitioner came to the precinct voluntarily, that Petitioner was not a suspect at first, and that, after Petitioner's first statement, Viggiano knew Petitioner was lying and read him his rights before getting the second statement. (*Id.* at 309, 311.) The prosecution also observed that Matthew Felton had an interest in the case because he was Petitioner's brother. (*Id.* at 310.) The prosecution also highlighted that Petitioner's statement changed after Viggiano noted that Petitioner had lied (*id.* at 312-13), and that both Petitioner's and Pridgen's statements were intertwined (*id.* at 322, 325). Finally, the prosecution noted that Petitioner's own statement put him at the scene of the crime and that he had an opportunity to leave but did not. (*Id.* at 328.)

Following the parties' closing arguments, the trial judge instructed the jury. After giving the instructions orally, the trial judge informed the jury that he would be giving them a typewritten form that set forth all of the elements of each crime. (*Id.* at 377.) Petitioner's trial counsel objected to the judge giving the jury the written form. (*Id.* at 392.)

On May 6, 1982, Petitioner and Pridgen were convicted of murder in the second degree. Petitioner was subsequently sentenced on June 7, 1982 to an indeterminate term of imprisonment of eighteen years to life.

Represented by counsel, Petitioner appealed to the New York Appellate Division citing four grounds: (1) the evidence was insufficient to convict; (2) the trial court erred in denying a motion to suppress Petitioner's confession on the ground that it was obtained in violation of his constitutional rights; (3) Petitioner received ineffective assistance of trial counsel; and (4) the Petitioner's Sixth Amendment right to confrontation was violated when the trial judge denied Petitioner's motion to sever the trial from his codefendant and allowed the

4

introduction into evidence of his codefendant's confession. (Ex. 1.) On November 15, 1984, the Appellate Division unanimously affirmed his conviction without opinion. *See People v. Felton*, 483 N.Y.S.2d 557 (App. Div. 1st Dep't 1984). On March 1, 1985, the Court of Appeals denied leave to appeal. *See People v. Felton*, 64 N.Y.2d 1018 (1985).

Sometime in late 1982, Petitioner's codefendant, Pridgen, filed a notice of appeal; however, for unexplained reasons, the appeal was not perfected until July 1989. (*See* Ex. 32.) The Appellate Division reversed Pridgen's conviction and remanded for a new trial. *See People v. Pridgen*, 552 N.Y.S.2d 845, 845 (App. Div. 1st Dep't 1990). Relying on three Court of Appeals decisions decided in 1987 and 1988, the Appellate Division held that it was reversible error for the trial judge to submit to the jury a typewritten summary of the elements of the crimes at issue if the defendant objects. *See id.* Pridgen subsequently pleaded guilty to robbery in the first degree and was sentenced to eight-and-one-third to twenty-five years of imprisonment. (*See* Resp't Opp'n at 15; Ex. 34 at 2.)

On May 5, 1993, Petitioner moved the Appellate Division, First Department, for a writ of error *coram nobis* on the ground that appellate counsel was ineffective for failing to raise the arguments that (1) the trial judge erred when it submitted written elements of the charged crimes to the jury, and (2) that Petitioner was denied equal protection of the law and due process because his codefendant's conviction was reversed. (Ex. 5.) The Appellate Division denied petitioner's motion on the merits but without explanation. *See People v. Felton*, 603 N.Y.S.2d 718 (App. Div. 1st Dep't 1993).

On January 11, 1994, Petitioner moved the New York State Supreme Court, Bronx County, to vacate his judgment of conviction pursuant to New York Criminal Procedure Law § 440.10 on the ground that he was denied due process of law and a fair trial when the trial judge submitted to the jury the written elements of the charged crimes. (Exs. 9, 11.) The court denied the motion on the merits. The Appellate Division granted leave to appeal and affirmed the order denying the motion on May 1, 1997. *See People v. Felton*, 657 N.Y.S.2d 34, 35 (App. Div. 1st Dep't 1997), *leave denied*, 91 N.Y.2d 872 (1997). In its ruling, the Appellate Division found that Petitioner's claims were procedurally barred based on Petitioner's failure to raise the issue on direct appeal. *Id.*

Before the Appellate Division ruled, Petitioner made a second § 440.10 motion on April 23, 1997. (Ex. 19.) In this motion, Petitioner argued that his Sixth Amendment right to confrontation was violated when the trial judge denied his motion to sever the trial and allowed a non-testifying codefendant's confession to be introduced into evidence. (*Id.* at 4.) Petitioner's argument was based on a change in the law announced in *Cruz v. New York*, 481 U.S. 186, 193-94 (1987), which held that the Sixth Amendment barred the introduction of a non-testifying codefendant's confession that "interlocked" with the defendant's own confession. (*Id.*) On July 14, 1997, the court denied the motion, stating that "[a]rguments raised in the Affirmation in Opposition are confirmed by a review of the confessions admitted into evidence at trial." (Ex. 20.) The Appellate Division denied leave to appeal on December 23, 1997. (Ex. 23.)

From December 2, 1998 through October 11, 2000, Petitioner filed three more motions for a writ of error *coram nobis*. The

5

first of these argued that appellate counsel was ineffective for failing to raise on appeal (1) whether the People proved its case beyond a reasonable doubt, and (2) whether the trial court improperly submitted to the jury written elements of the charged crimes. (Ex. 26.) Petitioner then filed a *coram nobis* motion arguing that appellate counsel was ineffective for failing to raise on appeal the claim that the People failed to prove beyond a reasonable doubt that a participant in the crime caused the victim's death by stabbing him. (Ex. 28.) His final *coram nobis* motion argued that appellate counsel was ineffective for failing to raise on appeal that (1) the evidence was circumstantial pursuant to *People v. Bearden*, 290 N.Y. 478 (1943) and *People v. Montanez*, 41 N.Y.2d 53 (1976), and (2) the evidence was insufficient pursuant to *In re Winship*, 397 U.S. 358 (1970). (Ex. 30.) All three motions were denied on the merits. (Exs. 27, 29, 31.)

B.  Procedural History

Petitioner filed his initial petition for habeas relief on June 29, 1998, and the case was assigned to the Honorable Kimba Wood, United States District Judge. On October 27, 1998, Judge Wood granted Petitioner's request to dismiss the petition without prejudice so that Petitioner could exhaust his claims in state court.

On July 10, 2001, Petitioner filed the Petition. Subsequently, Respondent filed a motion to dismiss arguing that Petitioner's claims were untimely, which Judge Wood granted on May 23, 2002. Petitioner appealed, and, on December 30, 2002, the Second Circuit remanded the case for reconsideration. On remand, in a June 22, 2002 Order, Judge Wood again found the Petition to be untimely. However, Petitioner moved for reconsideration pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure, and, on September 15, 2004, Judge Wood determined that the Petition was timely due to equitable tolling. The Petition was subsequently reassigned to the Honorable Kenneth M. Karas.

On November 29, 2004, Petitioner submitted a second motion to amend the Petition to add two additional grounds for relief. After Petitioner's release from custody on January 31, 2006, Judge Karas denied, on March 30, 2006, Petitioner's motion to amend as untimely. Petitioner purported to file an interlocutory appeal of the Court's order, but, on October 10, 2006, the Second Circuit dismissed the appeal for Petitioner's failure to pay the docketing fee or move to proceed *in forma pauperis*.

For the next several years, during which time Petitioner was on parole and the case was reassigned to my docket, neither Petitioner nor Respondent made any attempt to contact the Court regarding this matter.[4] Consequently, on October 26, 2009, the Court issued an Order directing Petitioner to submit a letter informing the Court whether, in light of his inaction and release from custody, he wished to pursue his habeas petition. On September 20, 2010, the Court entered another Order directing Petitioner to

---

[4] According to the New York State Department of Corrections and Community Supervision Inmate Lookup service, Petitioner was released on parole on January 31, 2006 and discharged from parole on February 23, 2012. *See* http://nysdoccslookup.doccs.ny.gov. Although Petitioner is no longer "in custody," "a habeas petition challenging a criminal conviction is rendered moot by a release from imprisonment only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Perez v. Greiner*, 296 F.3d 123, 125 (2d Cir. 2002). The Supreme Court has recognized a presumption that collateral consequences attach to criminal convictions post-release, *Sibron v. New York*, 392 U.S. 40, 54-56 (1968), and Respondent has offered no evidence to rebut that presumption. Accordingly, the Court finds that the Petition is not moot.

6

submit a letter informing the Court whether he wished to pursue his habeas petition. On September 28, 2010, Petitioner informed the Court that he did, in fact, intend to pursue the petition, and attached a copy of his timely response to the Court's Order of October 26, 2009, which apparently had been received but not properly filed.

On May 3, 2011, the Court entered an Order directing the parties to produce a copy of Petitioner's written confession. On May 20, 2011, Petitioner submitted the two earlier statements, but he stated that he could not locate the third statement. Respondent submitted a letter on June 2, 2011, stating that he could not locate any of the written statements. Both parties detailed the steps they took in trying to locate the confession, and the Court credits them for their diligence.

## II. DISCUSSION

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief only if a claim that was adjudicated on the merits in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The Petition raises four distinct grounds for relief, which the Court proceeds to address in turn.

### A. Submission of Written Elements of Charged Crimes to the Jury

Petitioner argues that his due process rights were violated by the trial court's submission of written elements of the charged crimes to the jury. (Petition at 5a.) However, the Court is procedurally barred from considering the merits of this claim because the state court's decision rests on an adequate and independent state-law ground.

On habeas review, a court's function is "to determine only whether the state ruling falls within the state's usual practice and is justified by legitimate state interests, not whether the state court ruling was correct." *Downs v. Lape*, 657 F.3d 97, 101 (2d Cir. 2011). Therefore, "federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Cone v. Bell*, 556 U.S. 449, 465 (2009); *accord Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).

The state court's reason for denying this claim – that Petitioner did not first raise it on his direct appeal – is an adequate and independent state law ground that prevents the Court from reaching the merits of this issue. "The unjustifiable failure to raise on direct appeal a claim that appears on the face of the record is a procedural default under New York law and therefore constitutes an independent and adequate state ground for the state court's rejection of the petitioner's claim." *Davis v. Mantello*, 42 F. App'x 488, 490 (2d Cir. 2002); *accord Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (holding that the district court erred by concluding that a failure to raise an issue on direct appeal was an inadequate ground to bar federal review). Petitioner did not raise this claim in his direct appeal but initially presented it in his first § 440.10 motion to vacate the sentence. In denying that motion, the trial court reached the merits of Petitioner's motion. (*See* Ex. 13.) On appeal, however, the Appellate Division

stated that the "motion court was procedurally barred from considering the merits of defendant's [§] 440.10 motion." *Felton*, 657 N.Y.S.2d at 35. The Appellate Division held that the issue was not appropriate for a § 440.10 motion because "[s]ufficient facts appeared on the record" to have permitted appellate counsel to raise the issue on direct appeal, and the failure to do so was not excusable. *Id.* Petitioner's failure to comply with the state court's procedural rules by raising this issue on direct appeal is thus an adequate and independent state-law ground for rejecting the claim. Indeed, in an unrelated case the Second Circuit has cited to the Appellate Division's decision rejecting Petitioner's claim as an example of an adequate and independent state law ground that precludes habeas review. *Davis*, 42 F. App'x at 490 (citing *Felton*, 657 N.Y.S.2d at 35).

Moreover, Petitioner cannot establish that this rule is not regularly followed. Courts consistently hold that it is a firmly established and regularly followed New York rule that state courts deny § 440.10 motions when the issues raised could have been presented on direct appeal but were not. *E.g.*, *Murden v. Artuz*, 497 F.3d 178, 192 (2d Cir. 2007); *Williams v. Goord,* 277 F. Supp. 2d 309, 318-19 (S.D.N.Y. 2003) ("[D]enial of a § 440.10 motion for failure to raise a claim on direct appeal represents the application of a firmly established and regularly followed New York rule.").

Finally, Petitioner has not established cause and prejudice sufficient to overcome this procedural bar. "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Clark*, 510 F.3d at 393 (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998)) (internal quotation marks omitted). Although ineffective assistance of counsel in violation of the Sixth Amendment can be cause sufficient to excuse a procedural default, *e.g.*, *Jones v. Armstrong*, 367 F. App'x 256, 257 (2d Cir. 2010), as explained in the following section, counsel was not ineffective for failing to raise this claim on direct appeal. Accordingly, Petitioner has presented no grounds for excusing the procedural default, and the Court may not review this claim.

B. Ineffective Assistance of Counsel

Petitioner argues that his appellate counsel was ineffective for (1) failing to argue that his conviction was not supported by sufficient evidence and failing to cite to specific decisions from the New York Court of Appeals, and (2) failing to argue that the trial judge's submission to the jury of a written summary of the elements of the crime violated Petitioner's due process rights. (Petition at 5a.)

Petitioner raised these issues in a series of motions for a writ of error *coram nobis*, which the Appellate Division denied on the merits without explanation. (Exs. 27, 29, 31.) Accordingly, the Court reviews Petitioner's claims according to the provisions in AEDPA. *Cf. Serrano v. Fischer*, 412 F.3d 292, 297 (2d Cir. 2005) (holding that when "state courts summarily reject a claim on the merits without explanation," review focuses on the "ultimate decisions of those courts, rather than on the courts' reasoning, to determine whether the decisions were contrary to, or an unreasonable application of, Supreme Court precedent" (internal quotation marks omitted)).

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's performance

8

"fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *see also Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) ("Although the *Strickland* test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel."). This is a highly deferential standard under which a reviewing court "must make 'every effort . . . to eliminate the distorting effects of hindsight,' and must operate with a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 688-89). The Court's review is particularly deferential when, as here, a state court has already considered and rejected Petitioner's claims of ineffective assistance of counsel. Thus, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding, "[t]he question is not whether a federal court believes the state court's determination under *Strickland* was incorrect but whether it was unreasonable – a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks omitted); *see Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011).

### 1. Failure to Argue That Petitioner's Conviction was Not Supported by Sufficient Evidence

Petitioner argues that appellate counsel was constitutionally ineffective because he failed to argue on direct appeal that Petitioner's conviction was not supported by sufficient evidence. (Petition at 5a.) In particular, Petitioner asserts that counsel's failure to cite to *In re Winship*, 397 U.S. 358 (1970), *People v. Bearden*, 290 N.Y. 478 (1943), and *People v. Montanez*, 41 N.Y.2d 53 (1976), constituted ineffective assistance. (Affidavit of Jose Felton, dated Oct. 11, 2000.)

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Winship*, 397 U.S. at 364. When a defendant's conviction rests entirely on circumstantial evidence, courts "examine the record in the light of the rule that the facts from which the inference of defendant's guilt is drawn must be established with certainty – they must be inconsistent with his innocence and must exclude to a moral certainty every other reasonable hypothesis." *Bearden*, 290 N.Y. at 480; *accord Montanez*, 41 N.Y.2d at 57.

While appellate counsel did not cite to the specific cases mentioned by Petitioner, appellate counsel did, contrary to Petitioner's assertion, argue that the evidence at trial was insufficient to allow a jury to conclude beyond a reasonable doubt that Petitioner was guilty of the crimes charged. (*See* Ex. 1 at 12-16.) For example, appellate counsel argued that the evidence showed Petitioner was a mere bystander, which is insufficient to find someone guilty of felony murder. (*See id.* at 12-13.) Counsel also argued that the evidence presented was insufficient to corroborate the statements in Petitioner's confession. (*See id.* at 14-16.) Thus, far from falling below an objective standard of reasonableness, counsel's performance was highly competent. Although Petitioner argues that counsel should have cited to specific decisions, none of those cases have any bearing on the specific facts of Petitioner's case, other than their recitation of the

9

general principle that an accused may be convicted only on proof beyond a reasonable doubt of every element necessary to constitute the charged crime. In contrast, appellate counsel properly relied on cases that were more factually on point to raise the issue of whether Petitioner's conviction was supported by sufficient evidence. Accordingly, the state court's determination that counsel's performance in this regard was not constitutionally ineffective is not an unreasonable application of the *Strickland* standard.

2. Failure to Raise the Issue of Submission of Written Elements to the Jury

Additionally, Petitioner argues that appellate counsel was ineffective because he failed to argue on direct appeal that the trial judge committed reversible error by providing the jury with a written summary of the elements of the charged crimes, over defense counsel's objection. (Petition at 5a.)

Appellate counsel's performance must be "assessed 'on the basis of the facts of the particular case viewed as of the time of counsel's conduct' without the benefit of hindsight." *Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (quoting *Mayo*, 13 F.3d at 533). An attorney is not required to "forecast changes or advances in the law." *Id*. (citation and internal quotation marks omitted); *see also Smith v. Murray*, 477 U.S. 527, 536 (1986) (holding that challenges to appellate counsel's effectiveness are viewed in light of the law existing at the time at which counsel was required to file the brief on appeal).

Petitioner's basis for arguing that counsel was ineffective is that his codefendant raised the submission of written elements of the charged crimes on direct appeal and obtained a reversal. However, Petitioner's codefendant perfected his appeal five years after Petitioner and presented this argument based on a string of New York Court of Appeals cases decided within the two years before perfection. In contrast, at the time of Petitioner's appeal, trial courts were permitted to submit to the jury written elements of the crimes charged. *See People v. Maye*, 396 N.Y.S.2d 381 (App. Div. 1st Dep't 1977). It was not until 1987 that the Court of Appeals first held that a trial court errs when it provides the jury with written portions of the jury instructions. *See People v. Owens*, 69 N.Y.2d 585, 591-92 (1987). Therefore, because the law at the time of Petitioner's appeal did not support this claim, the state court did not unreasonably apply federal law by concluding that appellate counsel's performance was reasonable even though he failed to raise this issue on appeal.

Accordingly, Petitioner's request for habeas relief on the grounds of ineffective assistance of appellate counsel is denied.

C. Equal Protection Violation

Petitioner next asserts that his rights under the Equal Protection Clause were violated because his codefendant's conviction was reversed based on the submission of written elements of the charged crimes to the jury. (Petition at 5a.) The main thrust of Petitioner's argument is that he is entitled to retroactive application of the change in law that benefitted his codefendant who perfected his appeal several years later. (Petition at 5a.)

For purposes of habeas relief, "clearly established Federal law" consists of the Supreme Court's holdings at the time of the state court proceeding in question. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005). The Supreme Court has never held that the Equal Protection Clause requires state courts

10

to retroactively apply new state law to vacate the conviction of a defendant where a codefendant was later able to vacate his sentence on the basis of an error that affected both individuals. *See Henry v. Ricks*, 578 F.3d 134, 140 n.2 (2d Cir. 2009). On the contrary, "the Constitution does not require a state's highest court 'to make retroactive its new construction of [a criminal] statute.'" *Henry*, 578 F.3d at 140 (quoting *Wainwright v. Stone*, 414 U.S. 21, 23-24 (1973)). Accordingly, courts have recognized that the equal protection clause is not implicated in situations such as this where a petitioner and codefendant both appealed their convictions and the appellate court first affirmed the petitioner's conviction but later vacated his or her codefendant's conviction for a reason that was equally applicable to both. *See, e.g.*, *Bumpus v. Warden, Clinton Corr. Facility*, 702 F. Supp. 2d 155, 164-69 (E.D.N.Y. 2010); *accord Fiore v. White*, 149 F.3d 221, 226 (3d Cir. 1998) (holding "that neither the Due Process Clause nor the Equal Protection Clause mandates retroactive application of" a state court decision to codefendants).

Petitioner's codefendant benefitted from a change in the law because his appeal was delayed, and obtained a reversal of his conviction as a result of the New York Court of Appeals' decision in *Owens*. However, Petitioner's direct appeal had concluded – and thus his conviction had become final – before the decision in *Owens* held that it was reversible error for trial courts to provide the jury with written elements of the charged crimes. Because the New York Court of Appeals has not held that this decision applies retroactively, and there is no Constitutional requirement that it do so, the disparity between Petitioner and his codefendant does not violate the Equal Protection Clause. Accordingly, Petitioner is not entitled to habeas relief on this ground.

D.  Right to Confrontation Violation

Finally, Petitioner argues that his Sixth Amendment right of confrontation was violated when the trial court allowed the introduction of Pridgen's confession after denying Petitioner's motion to sever his trial from Pridgen.[5] (Petition at 5a.)

The Supreme Court held in *Bruton v. United States* that the Sixth Amendment's Confrontation Clause bars the admission into evidence of a non-testifying codefendant's confession. 391 U.S. 123, 135-36 (1968). However, at the time of Petitioner's trial, the Second Circuit recognized an exception to the *Bruton* rule and allowed the introduction of a non-testifying codefendant's confession if the confession interlocked and was factually consistent with the defendant's confession. *See Graham v. Hoke*, 946 F.2d 982, 989 (2d Cir. 1991). After Petitioner's conviction became final in 1985, the Supreme Court held that *Bruton* barred the introduction of these "interlocking statements." *See Cruz*, 481 U.S. at 193-94. The Second Circuit has since held that the *Cruz* decision applies retroactively to cases, like this one, where the conviction is under collateral review. *See Samuels v. Mann*, 13 F.3d 522, 526 (2d Cir. 1993). Accordingly, because Pridgen

---

[5] To the extent that Petitioner challenges the trial court's denial of his motion to sever as an error of state law, habeas relief is not available. *See Estelle*, 502 U.S. at 67-68. Similarly, although a denial of a motion to sever may, in certain circumstances, render a trial fundamentally unfair and violate due process, such that it could be a basis for granting habeas relief, a petitioner must establish "actual prejudice." *See Herring v. Meachum*, 11 F.3d 374, 377 (2d Cir. 1993); *Matthews v. Artuz*, No. 97 Civ. 3334 (DC), 1999 WL 349694, at *3 (S.D.N.Y. May 27, 1999). Other than asserting the trial court improperly admitted Pridgen's confession, Petitioner does not articulate any other prejudice that flowed from his combined trial. Thus, as described in greater detail below, Petitioner cannot meet the stringent standard to establish actual prejudice.

did not testify at trial, the introduction of his confession violated Petitioner's rights under the Sixth Amendment.

Although the introduction of Pridgen's statement indisputably violated Petitioner's constitutional rights, "[v]iolations of the *Cruz* rule are subject to harmless error analysis." *Graham*, 946 F.2d at 995; *see Cruz*, 481 U.S. at 194. On habeas review, to evaluate whether a *Cruz* violation was harmless, courts must consider whether the admission of the non-testifying codefendant's statement had a "substantial and injurious effect or influence in determining the jury's verdict." *Wood v. Ercole*, 644 F.3d 83, 93-94 (2d Cir. 2011) (quoting *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007)).

The Second Circuit has explained that the following factors may be relevant when determining whether a *Cruz* violation was harmless. First, and most important, is the weight of the prosecution's case against the defendant. *See, e.g.*, *Samuels*, 13 F.3d at 526. Courts must also consider "the nature and content of the defendant's own statement, in particular, whether it satisfactorily explains his or her part in the crime without reference to the codefendant's statement." *Samuels*, 13 F.3d at 526-27 (citation and internal quotation marks omitted). "The extent to which the defendant's statement is corroborated or contradicted by other objective evidence," as well as whether the defendant repeated his statement on more than one occasion, may also be relevant. *Id.* at 527. Additionally, the prosecutor's conduct with respect to the improperly admitted evidence may be relevant to assessing the importance of the wrongly admitted testimony and whether that evidence was cumulative. *See Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir. 2004).

In this case, Viggiano testified that Petitioner stated that on the night of the incident, he, Pridgen, and Diaz left Gier's apartment after eating Chinese food and drinking rum. (Vol 1 Tr. at 97-98.) According to Viggiano, Petitioner then confessed that while in the lobby of Gier's building, he Pridgen, and Diaz "discussed whether or not [Gier] had eight hundred dollars in cash in the apartment and asked the possibility of how the T.V. set of the decedent could be stolen out of the apartment building without being bothered by the doorman." (*Id.* at 103.) Viggiano then recounted the rest of the details that Petitioner provided regarding how the three men went back up to Gier's apartment, how Diaz entered and attacked Gier, and how Pridgen and Petitioner subsequently entered and left with Gier's television. (*Id.* at 103-04.)

Pridgen's confession provided some additional details about the discussion that took place in the lobby after the men left Gier's apartment but was otherwise entirely consistent with, and cumulative of, Petitioner's confession. Specifically, Viggiano testified that Pridgen stated that while in the lobby "they all had conversations about ripping off [Gier]. [Petitioner] had said that [Gier] had gotten paid and had some money. And [Pridgen] said that he wanted to hold [Gier's] T.V. for a while. He said that [Diaz] asked [Petitioner] questions about the money and where it was." (*Id.* at 125-26.)

Even stripped of the additional details provided by Pridgen, Petitioner's own confession independently and powerfully establishes his participation in the plan and ultimate robbery of Gier. Pridgen's statement that the parties discussed "ripping off Gier," while not explicitly mentioned in Viggiano's description of Petitioner's confession, is implicit from Petitioner's

12

statements that the parties discussed how much money Gier had in his apartment and whether they could steal Gier's television. Similarly, Pridgen used different terms, but Petitioner's own confession explains that before returning to Gier's apartment, the parties discussed stealing Gier's television and how much money Gier had in cash. Thus, this situation is unlike *Zappula*, where the improperly admitted confession filled in a missing link in the theory of the case and was, thus, not harmless error. *See Zappulla*, 391 F.3d at 472. Although Pridgen's statements provided some additional detail about the events leading up to the robbery and murder of Gier, in light of the unchallenged statements in Petitioner's own confession, which sufficiently explained his involvement in the robbery without reference to Pridgen's confession, the Court cannot conclude that the introduction of Pridgen's confession substantially impacted the jury's verdict. *Cf. Samuels*, 13 F.3d at 528 (finding admission of codefendant's confession harmless in part because it was cumulative of other evidence).

Additionally, while the Prosecution's case against Petitioner rested in large measure on his confession, the other evidence introduced at trial was nonetheless weighty and corroborated Petitioner's confession. As an initial matter, it bears noting that the Court need not conclude that the evidence against Petitioner was overwhelming in order to find that the admission of Pridgen's confession was harmless. *See Samuels*, 13 F.3d at 527. "Indeed, in *Brecht*, the Court found the evidence of the petitioner's guilt to be 'if not overwhelming, certainly weighty.'" *Id.* (citing *Brecht*, 507 U.S. at 639). In addition to Petitioner's confession, which explained his involvement in all aspects of the charged offense, Petitioner's fingerprints were found on a glass and rum bottle in the decedent's apartment, and police later recovered Gier's television from the apartment of Pridgen's girlfriend. (Vol 1 Tr. at 129-30; Vol. 2 Tr. at 182-84.) Petitioner's fingerprints on the glass corroborate that he had been with Diaz and Pridgen drinking rum in Gier's apartment on the day of the murder, and the recovery of Gier's television is consistent with Petitioner's statement that Pridgen took the television and ran out of Gier's apartment. Additionally, the receipt from Radio Shack combined with Petitioner's statement that he saw Gier's telephone amplifier corroborate that Petitioner was with Gier on the night of the murder. Moreover, the evolving series of confessions that Petitioner gave to Viggiano also provides significant evidence of his culpability. Accordingly, in light of the fact that Petitioner's own confession detailed his involvement in all essential aspects of the charged crime and was significantly corroborated by physical evidence introduced at trial, the Court cannot conclude that the case against him was so thin that the introduction of Pridgen's statement had a substantial impact on the jury's verdict.

Finally, while the prosecution heavily emphasized both confessions during closing argument without separating them, this does not establish that the introduction of Pridgen's statement had a substantial and injurious effect on the jury's verdict. During closing argument, the prosecutor stated that: "[Petitioner and Pridgen's] statements basically are pretty intertwined[,] and I don't want to separate one from the other, but I would ask you to take them into the jury room with you, if you think it is appropriate." (Vol. 2 Tr. at 322.) There was nothing improper about the prosecutor's comments because Pridgen's statement had been admitted into the evidence. *Cf. Wood*, 644 F.3d at 98 (noting that the prosecutor properly emphasized a statement that had been admitted into evidence even though its

13

admission was later held to be improper under *Cruz*).

Moreover, at one point, the prosecutor *did* separate out Petitioner's statement: "In point of fact, his own statement . . . revealed . . . his immediate involvement in this case, he participated when he went downstairs with the other two, he could have walked out of the building, he didn't do that according to his own statement." (*Id.* at 328.) "He had the intent, according to his statements there, he had the intent of robbery that robbery take place and he participated in it and left with the guy carrying the T.V., got in the same cab with him and took a ride." (*Id.* at 329.) Particularly because the confessions overlapped in large measure and neither contained significant information that the other did not, the prosecutor's request that the jury consider the statements together does not persuade the Court that the improper admission of Pridgen's confession had a substantial effect on the jury's verdict.

Therefore, while the case against Petitioner relied in large measure on the confessions, Petitioner's confession was properly presented to the jury and, combined with the corroborating evidence and Petitioner's prior, incomplete statements, constituted sufficiently "weighty" evidence of Petitioner's guilt even without Pridgen's confession. Therefore, the Court concludes that the introduction of Pridgen's statement, which was largely cumulative, was harmless.

## IV. CONCLUSION

For the foregoing reasons, Petitioner's application for a writ of habeas corpus is DENIED. A certificate of appealability will not issue because Petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2); *see also Love v. McCray*, 413 F.3d 192, 195 (2d Cir. 2005). The Clerk of the Court is respectfully directed to enter judgment in favor of Respondent and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 26, 2012
New York, New York

\* \* \*

Petitioner Jose Felton appears *pro se*.

Respondent William Mazzuca is represented by Nancy D. Killian, Office of the District Attorney, Bronx County, 198 E. 161 Street Bronx, NY 10451.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/27/2012

<u>Copies of this Order have been mailed to:</u>

Jose Felton
2078 2nd Avenue #4D
New York, NY 10029

Nancy D. Killian, Esq.
Bronx County District Attorney's Office
198 E. 161 Street
Bronx, NY 10451